UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In Re:

MARK T. DUNNETT,                                              Chapter 7
                                                             Case No.: 11-62156
                                    Debtor.

_____

In Re:

WILLIAM J. McDONALD,                             Adv. Pro. No.: 11-80038

                                    Plaintiff,

vs.

MARK T. DUNNETT,

                                    Defendant.

_____

APPEARANCES:

ROBERT S. BEEHM, ESQ.
*Attorney for Plaintiff*
84 Court Street, Suite 201
Binghamton, New York 13901

SHAW, O'BRIEN, CROWLEY & REYNOLDS          KIERNAN CROWLEY, ESQ.
*Attorneys for Debtor-Defendant*
55 Main Street
Binghamton, New York 13905

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

Bankruptcy courts are often presented with dischargeability cases that involve related family members or long-time, close friends. *See, e.g., Daly v. Braizblot (In re Braizblot)*, 194 B.R. 14, 21 (Bankr. E.D.N.Y. 1996) (noting that these are "the most difficult dischargeability cases"). This is one such case where the Court must decide whether a significant debt that arose by virtue of the litigants' former friendship is now dischargeable in bankruptcy.

Plaintiff William J. McDonald ("McDonald") commenced this adversary proceeding by filing a verified complaint against Debtor-Defendant Mark T. Dunnett ("Debtor") on November 18, 2011 ("Complaint," ECF Adv. No. 1), seeking a determination that a debt owed to him by Debtor in the amount of $199,000.00 is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), (B), (a)(4), and (a)(6).[1]    Debtor timely served and filed an Answer to the Complaint on December 16, 2011 (ECF Adv. No. 4), therein denying the material elements of the Complaint.  The Court issued a Scheduling Order on January 19, 2012 (ECF Adv. No. 5), scheduling this matter for trial on September 20, 2012.  The parties filed a pre-trial Joint Stipulation of Facts on September 14, 2012 ("Joint Stipulation," ECF Adv. No. 8).  The trial commenced on September 20, 2012, but was continued and concluded on October 5, 2012.  As directed by the Court at the close of trial, Debtor filed a post-trial Memorandum of Law on October 18, 2012 ("Debtor's Memorandum," ECF Adv. No. 12), and McDonald followed suit by filing his post-trial Memorandum of Law the next day ("Plaintiff's Memorandum," ECF Adv. No. 13).   Following the parties' post-trial submissions, the Court took the matter under advisement.[2]  Based upon the record created in this adversary proceeding, this decision sets forth the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

---

[1]  Unless otherwise indicated, citations to statutory section numbers are to sections within the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. §§ 101–1532 (2010).

[2]  Because McDonald failed with respect to his §§ 523(a)(4) and (a)(6) claims to pursue them at trial and to address them in his post-trial submission, the Court concludes that McDonald has abandoned these claims against Debtor. *See Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 550 (Bankr. N.D.N.Y. 2012) ("Because the plaintiff bears a heavy burden of proof in . . . dischargeability litigation, . . . a plaintiff's failure to argue the applicability of certain causes of action in a post-trial brief may result in the abandonment of such claims and, hence, their removal from the Court's consideration.") (citing cases); *In re Pimpinella*, 133 B.R. 694, 695 n.1 (Bankr. E.D.N.Y. 1991) ("Plaintiff's failure to pursue its [denial of discharge] claim . . . at trial, as well as its failure to address such claim in its post-trial submissions, allows this Court to deem such claim as abandoned.").

## JURISDICTION

This adversary proceeding is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a), (b)(1), and (b)(2)(I), and 1334(b).

## FACTS

The Court draws the following findings of fact from the docket, the Joint Stipulation, oral and documentary testimony, and the parties' post-trial submissions.[3]  The facts themselves are largely undisputed, but the parties differ in their application of the facts to the controlling law.

McDonald met Debtor in the late 1990s while both men were working for IBM.  Both men testified that they became friends during their years as colleagues at IBM, although they did not socialize outside the workplace.

While colleagues at IBM, Debtor told McDonald of his plans to open and operate a full-time bluestone quarry business at his sixty-two acre homestead in Forest Lake Township, Pennsylvania (the "Quarry Property"), which Debtor's parents deeded over to him and his wife on June 26, 1987.  (Pl.'s Ex. 1.)  Before leaving IBM to focus exclusively on the quarry business, Debtor asked McDonald if he would privately fund certain start-up costs for the quarry business. (Joint Stip. at 1.)  McDonald testified that his knowledge of the quarry business was limited to what Debtor had shared with him during several of their workplace conversations and that he believed Debtor was an "expert" in the quarry business.  McDonald testified that although Debtor did not make any representations during their initial discussions regarding the quantity or quality of stone that the quarry was expected to produce, McDonald was nonetheless assured by Debtor's optimism regarding the new business venture.

McDonald agreed to provide funding for the quarry business, and between November 2005 and November 2007, McDonald completed a series of thirteen loan transactions with

---

[3] The record in this proceeding does not include a trial transcript.

Debtor.  During this two year period, the parties communicated mainly via email.  Hence, all of

their loan negotiations were fully documented.  McDonald testified that he considered himself as

the "banker," while Debtor was the "operator," of the quarry business.  McDonald further

testified that he thought their relationship was a partnership whereby he would contribute the

money necessary to fund the quarry operation and Debtor would contribute the property, labor,

and skill necessary to run the quarry operation.

In the fall of 2005, the parties exchanged emails regarding the proposed terms of the first

loan transaction for $18,000.00, which was completed in November 2005.  (Pl.'s Exs. 1–5.)  In

McDonald's September 13, 2005 email to Debtor, McDonald asked Debtor if he would agree to

an additional term that had been inadvertently omitted from McDonald's original loan proposal,

to wit, to allow McDonald to place a lien against Debtor's IBM pension and tax deferred savings

plan proceeds.  (Pl.'s Ex. 4.)  Debtor agreed to this term in his November 14, 2005 reply email to

McDonald.  (Pl.'s Ex. 5.)  McDonald acknowledged at trial, however, that the parties never

discussed specific details regarding Debtor's retirement accounts, including account balances or

whether Debtor had borrowed against the accounts, and Debtor never formally pledged his

retirement savings as collateral for the personal loans.

McDonald drafted the first loan agreement that specifically allocated the funds for the

"geological exploration" of the Quarry Property.  (Pl.'s Ex. 6.)  The agreement also contemplated

the future enactment of mutually agreeable terms, including, but not limited to "1) an additional

official check(s), 2) a portion of the amount for which subject property is sold (sale of subject

property is at the sole discretion of [Debtor]), 3) a partnership interest in any business venture(s)

that may result from this or any future geological exploration of subject property, . . . ."  (*Id.*)

Both parties signed the agreement and the funds changed hands on November 16, 2005 ("Loan

1"). Debtor hired Eichelbergers, Inc. ("Eichelbergers") to perform drilling at the Quarry Property, which cost $12,673.95. (Pl.'s Ex. 8.) In Debtor's January 18, 2006 email to McDonald, which Debtor based upon the verbal report he received from Eichelbergers following the drilling, he advised McDonald that "the core job went ok. Found nice stone deep. Cost more to un-cover and remove." (Pl.'s Ex. 7.) On or about January 31, 2006, Debtor repaid Loan 1 in full. (Pl.'s Ex. 9.)

On March 18, 2006, Debtor emailed McDonald to request a second loan from McDonald for $20,000.00 to $40,000.00, subject to a sixty-day repayment term. (Pl.'s Exs. 11–12.) In this email, Debtor advised McDonald that he had received a permit to begin excavation and that he had found a significant amount of both redstone and bluestone block, and that he had verbal purchase offers from multiple parties for the mined stone. (Pl.'s Ex. 12.) McDonald agreed to loan Debtor $30,000.00, subject to full repayment within sixty days. (Pl.'s Ex. 13.) McDonald drafted the loan agreement for the second loan, which was executed by both parties and closed on March 23, 2006 ("Loan 2"). (Pl.'s Ex. 15.) The agreement for Loan 2 included language identical to that found in the agreement for Loan 1 regarding the future enactment of mutually agreeable terms, but it also provided that McDonald "retain[ed] the right to seek a lien against [Debtor's] property and/or machinery and equipment not to exceed 100% of the amount of this loan." (*Id.*) In Debtor's June 2, 2006 email to McDonald, Debtor advised McDonald that he sold over $9,000.00 in stone rubble and fieldstone and that he anticipated selling ten blocks per day at a rate of $2,000.00 per block. (Pl.'s Ex. 21.) On June 22, 2006, Debtor repaid Loan 2 in full.

Around the time of Loan 2, Debtor began purchasing machinery and equipment for use in the quarry business. In February 2006, Debtor obtained financing from Sandvik for the purchase

of a Commando 120H hydraulic drill from Contractors Sales Company for $123,500.00.  (Pl.'s Ex. 10.)  In April 2006, Debtor purchased a used Caterpillar 992C ("CAT 992C") from Tribbe Tires for $128,000.00.  (Pl.'s Ex. 17.)  Debtor also purchased replacement tires and customized quarry forks for the CAT 992C, which collectively cost $30,792.00.  (Pl.'s Exs. 14, 16.)  Debtor borrowed $60,000.00 for the down payment on the CAT 992C from Pennstar Bank, A Division of NBT Bank, NA ("Pennstar").  On April 12, 2006, Debtor executed a $60,000.00 Promissory Note to Pennstar pledging the CAT 992C as collateral.  In May 2006, Debtor also contracted with Ken Rauch Excavating to build a roadway into the Quarry Property, which cost $49,940.00.  (Pl.'s Ex. 19.)  On May 26, 2006, Debtor borrowed $50,000.00 from Pennstar, as evidenced by a Promissory Note executed on the same date.  (Pl.'s Ex. 20.)  On June 14, 2006, Debtor borrowed another $10,000.00 from Pennstar, as evidenced by a Promissory Note executed on the same date.  (Pl.'s Ex. 22.)  McDonald testified at trial that he was unaware of Debtor's relationship with Pennstar during the period in which McDonald loaned Debtor money.  McDonald further testified that he was unaware of the day to day start up or operating costs incurred by Debtor with relation to the quarry business.

In McDonald's August 4, 2006 email to Debtor, McDonald referenced a visit that he had made to the Quarry Property and he suggested that Debtor look into forming an LLC.  McDonald also questioned whether the parties should formalize their purported partnership agreement, but he indicated that he would need Debtor's guidance with respect to the same.  (Pl.'s Ex. 24.)

On August 18, 2006, Debtor and McDonald executed a third loan agreement for $45,000.00, subject to full repayment within ninety days ("Loan 3").  McDonald drafted the agreement, which reiterated that the parties could agree on "additional arrangements," including, but not limited to, McDonald's acquisition of a partnership interest in the quarry business.  (Pl.'s

Ex. 27.)  Although McDonald made several more loans to Debtor over the course of the next eighteen months, the Debtor defaulted on the third and final agreement.  These loans originated and were made on the basis of the parties' email communications and without any formal documentation between the parties.

In Debtor's September 12, 2006 email to McDonald, Debtor asked McDonald for another loan of $35,000.00 to $45,000.00, which he stated would be used to finish the blasting.  (Pl.'s Ex. 28.)  Debtor also told McDonald that he had paid $8,900.00 in equipment repair costs.  In exchange for the loan, Debtor advised McDonald that the parties "could go with % of profit next year as a bonus," and that they would "be in heaven" once he got "down to the plate."  (*Id.*)  McDonald replied to Debtor on September 17, 2006, and in that email he asked Debtor about the cash inflow, business plan, and books for the quarry business.  (Pl.'s Ex. 29.)  McDonald also indicated that he was hoping he and Debtor would "each have [their] first $100K by now, or at least that much to split!"  (*Id.*)  Debtor responded to McDonald by email on September 24, 2006, wherein he asked for $10,000.00 by the following day because his labor costs, pallets, and quarry insurance premiums were all coming due.  (Pl.'s Ex. 30.)  Debtor also told McDonald that he had forty-seven pallets of standup stone ready for sale.  (*Id.*)  McDonald replied to Debtor via email on September 27, 2006, wherein he stated that he would loan Debtor $35,000.00.  (Pl.'s Ex. 31.)  McDonald also suggested that he be paid $200,000.00 for his "efforts so far," since the loan balance would be $115,000.00 once the additional funds were advanced.  Alternatively, McDonald proposed that he receive one-third or some other mutually agreeable cut of the future net profits.  (*Id.*)

On September 28, 2006, and unbeknownst to McDonald based upon his testimony at trial, Debtor borrowed $65,900.00 from Pennstar, as evidenced by a Promissory Note executed on the same date.  (Pl.'s Ex. 32.)

On October 2, 2006, Debtor emailed McDonald and agreed to the terms proposed by McDonald on September 27, 2012.  (Pl.'s Ex. 33.)  Specifically, Debtor stated that they could "go for" $200,000, with a repayment date of June 2007, or, alternatively, a one-third interest in the quarry business.  (*Id.*)  On or about October 3, 2006, McDonald gave Debtor a check for $13,000.00 from McDonald's Visions Federal Credit Union ("VFCU") account ("Loan 4").  (Pl.'s Ex. 94.)  On or about October 5, 2006, McDonald gave Debtor a check for $32,000.00 from his VFCU account ("Loan 5").  (*Id.*)  On October 23, 2006, McDonald emailed Debtor to again ask if Debtor agreed to a profit sharing arrangement of "33% starting 1/2007 plus a lump sum early-mid 2007?"  (Pl.'s Ex. 37.)  Debtor responded to McDonald by email the next day, stating "[y]our plan sounds good."  (Pl.'s Ex. 38.)  On or about October 25, 2006, McDonald gave Debtor a check for $25,000.00 from his VFCU account ("Loan 6").  (*Id.*)

On October 31, 2006, Debtor emailed McDonald to ask for additional funds of $30,000.00 because he needed to pay for significant equipment repairs.  (Pl.'s Ex. 39.)  McDonald responded by email the next day, wherein he voiced his concerns about the outstanding loan amount in the absence of any accounts receivable.  (Pl.'s Ex. 40.)  In McDonald's words, the "Bank of McDonald [was] going to go belly-up if the loans continue[d] to amass, without any accounts receivable activity."  (*Id.*)  McDonald further indicated that he understood equipment failures would necessitate speedy repairs, but he expected at that point that sales would cover both labor and fuel costs.  (*Id.*)  He asked Debtor to provide him with a "one page summary of the rough financials," which McDonald testified he never received.  In

fact, both parties testified at trial that Debtor never provided McDonald with books or records, financial summaries, or a business plan for the quarry business.  McDonald closed his email by stating, "I still believe you when you say that next year will be good for all of us but I did not envision this much cash outlay before seeing a steady stream of income."  (*Id.*)  Debtor never responded directly to McDonald's November 1, 2006 email.

On or about November 2, 2006, McDonald gave Debtor a check for $25,000.00 from his VFCU account ("Loan 7").  (Pl.'s Ex. 95.)  On or about the same date, McDonald gave Debtor another check for $5,000.00 from his VFCU account ("Loan 8").  (*Id.*)

On November 16, 2006, McDonald emailed Debtor the following: "Do you agree that the current open amount of my . . . loans to you is $145,000?"  (Pl.'s Ex. 43.)  McDonald continued, "As with the previous loans, the same terms as our notarized agreements are in effect, plus the agreed to 33% of net income beginning January 2007 as well as a $200,000 one-time payment in June 2007."  (*Id.*)  Debtor did not respond directly to this email, but he sent McDonald subsequent emails requesting additional money.  (Pl.'s Exs. 51, 52.)  On or about December 15, 2006, McDonald gave Debtor a check for $7,000.00 from his VFCU account ("Loan 9").  (Pl.'s Ex. 95.)

On January 11, 2007, Debtor emailed McDonald to ask for "a little help," therein indicating that he "could really use 20-25K" because he had spent his emergency fund to start work on the replacement of the CAT 992C motor.  (Pl.'s Ex. 46.)  McDonald replied by email the next day, wherein he advised Debtor that it was "no problem," but it would "take a few weeks" to get the cash.  (Pl.'s Ex. 47.)  He also asked Debtor whether the repairs to the CAT 992C would increase its value.  (*Id.*)  On January 16, 2007, Debtor emailed McDonald to let him know that he was trying to schedule the CAT 992C motor repair for late February or early

March, and that he believed the value of the machine would increase to between $325,000.00 and $375,000.00 once repaired.  (*Id.*)

On February 1, 2007, Debtor emailed McDonald to ask him whether he could get money for the CAT 992C repairs.  (Pl.'s 48.)  Debtor advised McDonald that he had sent another $20,000.00 to the repairman, bringing the total paid to $47,500.00.  (*Id.*)  McDonald responded by email on the same date to let Debtor know that he could not withdraw more money for a couple more weeks.  (Pl.'s Ex. 49.)

On February 22, 2007, Debtor emailed McDonald to confirm that the repairman was going to charge $82,000.00 to repair the CAT 992C motor and other parts, as originally estimated.  (Pl.'s Ex. 52.)  He also told McDonald that he wanted to go to his bank to ask for a "120 day note" to pay the remaining balance on the CAT 992C repair bill.  (*Id.*)  On February 28, 2007, Debtor borrowed $25,000.00 from Pennstar, as evidenced by a Promissory Note executed on the same date.  (Pl.'s Ex. 53.)

On March 1, 2007, Debtor emailed McDonald to inform him that if the equipment company would not work with him to lower the estimate and repair costs for the CAT 992C, then he would be "looking at offers on [the] entire business."  (Pl.'s Ex. 55.)  In Debtor's March 2, 2007 email to McDonald, Debtor told McDonald that he would "sell everything," for "a good enough price."  (Pl.'s Ex. 56.)  Debtor indicated that he would be meeting with an appraiser whose specialty was to appraise bluestone quarries.  (*Id.*)

On or about March 23, 2007, McDonald gave Debtor a check for $20,000.00 from his VFCU account ("Loan 10").  (Pl.'s Ex. 95.)  On April 27, 2007, McDonald emailed Debtor and indicated that he was going to the bank that day to get the money for the CAT 992C repair bill. (Pl.'s Ex. 61.)  He also stated that he agreed the total amount Debtor owed him at that point was

$172,000.00.  (*Id.*)  In subsequent email exchanges, McDonald agreed that Debtor could use any money he had "stashed" towards repaying him for the business.  (Pl.'s Ex. 64.)  On or about May 17, 2007, McDonald gave Debtor a check for $15,000.00 from his VFCU account ("Loan 11"). (Pl.'s Ex. 95.)

On June 12, 2007, Debtor emailed McDonald to advise him that monthly expenses were approximately $33,000.00 for equipment lease payments and $25,000.00 to $32,000.00 for labor costs.  (Pl.'s Ex. 65.)  In that email, Debtor also indicated that he was "very serious about taking offers on selling," and he asked McDonald whether he would be interested in buying the quarry if Debtor were to hold the mortgage and help him run the operation and sell the mined stone. (*Id.*)  Debtor told McDonald that Debtor's wife wanted to move back to Vestal, New York, and that they had "found a place to purchase."  (*Id.*)

On July 24, 2007, McDonald emailed Debtor to ask him for repayment of $10,000.00. (Pl.'s Ex. 69.)   In a subsequent email from McDonald to Debtor dated August 10, 2007, McDonald thanked Debtor for repaying the $10,000.00 and "for the bonus."  (Pl.'s Ex. 70.) McDonald also asked Debtor whether there had been "[a]ny hits on selling [his] house?"  (*Id.*) On August 21, 2007, however, McDonald emailed Debtor to tell him that VFCU had advised him that Debtor's repayment check had been rejected by Debtor's bank.  (Pl.'s Ex. 71.)

On October 10, 2007, Debtor borrowed $204,000.00 from Pennstar, as evidenced by a Promissory Note executed on the same date.  (Pl.'s Ex. 74.)

In Debtor's November 13, 2007 email to McDonald, Debtor asked for an additional loan because he was short on operating capital.  (Pl.'s Ex. 76.)  McDonald responded to Debtor on the same day and asked whether Debtor contemplated any repayment by the year's end of the $196,000.00 then due to McDonald.  (Pl.'s Ex. 75.)  McDonald also indicated that he could

possibly loan Debtor another $3,000.00.  (*Id.*)  On or about November 16, 2006, McDonald gave

Debtor a check in that amount from his VFCU account ("Loan 12").  (Pl.'s Ex. 93.)  That loan

was followed by a final loan from McDonald to Debtor in the amount of $9,000.00 on or about

June 14, 2007 ("Loan 13").  (*Id.*)

In the summer of 2008, McDonald wrote to Debtor to determine the status of the parties'

agreement and to inquire regarding Debtor's plans for repayment.  (Pl.'s Ex. 79.)  In his July 31,

2008 email to Debtor, McDonald wrote, "I am still trying to help and am thinking of alternatives

that would work for us both."  (*Id.*)  He continued, "I continue to be patient and have not given

up on our relationship but I hope you agree that the time has come for some finite plans please."

(*Id.*)  McDonald testified that between November 2007 and early January 2009, he attempted to

reach Debtor by email and telephone but Debtor was unresponsive.

On August 29, 2008, Debtor sold the Quarry Property in an arms-length transaction to

Adam and Julie Diaz for the purchase price of $559,570.00, and Debtor received $148,616.65 at

closing from the sale.  (Pl.'s Exs. 81, 83.)  On the same date, Debtor purchased his current

residence located at Castleman Road in Vestal, New York (the "Vestal Property") for

$549,500.00, which is subject to two mortgage loans in the original aggregate amount of

$300,000.00.  (Pl.'s Ex. 82.)  Debtor applied the sale proceeds from the Quarry Property to the

purchase of the Vestal Property rather than to the outstanding balance due to McDonald.

On January 31, 2009, Debtor advised McDonald that they still owned the CAT 992C and

at least one other piece of equipment.  (Joint Stip. at 6.)  On February 2, 2009, McDonald

emailed Debtor and asked him why he wouldn't want to sell the equipment given that he had

sold the Quarry Property.  (Pl.'s Ex. 86.)  Debtor replied to McDonald on March 6, 2009,

wherein he advised McDonald that the resale market for the equipment was "dead," but that he

would be able to repay McDonald as soon as he could sell the equipment.  (Pl.'s Ex. 87.)  By March 12, 2009, the parties' relationship had deteriorated and McDonald sent Debtor an email indicating that he believed Debtor had sold the Quarry Property without his consent and used the proceeds to pay off business debts related to the quarry business and to make a down payment on the Vestal Property.  (Pl.'s Ex. 89.)  Debtor responded via email to McDonald on March 25, 2009, therein stating that the CAT 992C "might be sold," and that the sale proceeds would pay McDonald in full.  (Pl.'s Ex. 90.)  On March 25, 2009, McDonald replied, "sounds like good news but our existing terms must remain in effect until loan is fully settled, including original property rights."  (Pl.'s Ex. 91.)

Sometime in 2009, Debtor sold the CAT 992C to Chad Hollenbeck in Montrose, Pennsylvania for $125,000.00.  (Joint Stip. at 7.)  Debtor did not, however, inform McDonald of this transaction or use any of the proceeds to pay the outstanding loan balance due to McDonald.  (*Id*.)  Similarly, although Debtor had discussed the possibility of selling the Quarry Property in emails to McDonald, McDonald testified that he actually learned of the sale of the Quarry Property and Debtor's purchase of the Vestal Property from a third party co-worker rather than from Debtor directly.  Debtor used the proceeds from the sale of the Quarry Property and/or the CAT 992C largely to purchase the Vestal Property, which is now in foreclosure in state court.  (Joint Stip. at 8.)  McDonald also learned through the course of seeking repayment from Debtor that, in 2008, a $104,443.96 federal tax lien was filed against Debtor as a result of Debtor's failure to pay his federal personal income taxes.

McDonald testified that he successfully sued Debtor in state court and obtained a judgment but he was unable to enforce the same because, on October 14, 2011, Debtor filed the underlying voluntary petition for chapter 7 relief with this Court, together with the requisite

schedules and statements.  On Schedule F, titled "Creditors Holding Unsecured Nonpriority Claims," Debtor listed total unsecured debt of $319,058.10.  Of that amount, $274,815.13 is judgment debt attributable to an August 24, 2011 judgment awarded in favor of McDonald.

## ARGUMENTS

McDonald bases his Complaint on Debtor's alleged fraud.  McDonald avers in the first instance that the judgment debt is nondischargeable under § 523(a)(2)(A) because the subject loans were procured by false pretenses, false representations, or fraud.  Specifically, he argues that "Debtor intentionally fostered and created an ongoing impression that he and McDonald were business partners in the quarry, each contributing to the mutual success of the business and therefore each other."  (Pl.'s Mem. at 11.)  McDonald asserts that Debtor continually reinforced McDonald's mistaken belief that he was an equity partner in the quarry business and that Debtor induced McDonald to continue lending through material misrepresentations and omissions regarding the amount and quality of the bluestone that could be mined from the Quarry Property, the financials relating to the quarry business, and Debtor's ability to repay McDonald either from his personal or business assets.  (*Id.* at 11–13.)  According to McDonald, Debtor's course of conduct led McDonald to justifiably believe that he and Debtor were exclusive business partners, that he was an equity partner in the quarry business rather than a mere lender, that the quarry business would generate large profits, and that he was secured by the businesses ownership of equipment and real property.  (*Id.* at 16.)

Alternatively, McDonald argues that the judgment debt is nondischargeable under § 523(a)(2)(B) because Loans 4 through 13 were obtained by Debtor's fraudulent use of materially false written statements respecting his financial condition upon which McDonald relied.  In particular, McDonald states that the parties' email communications show that "Debtor made

multiple material representations regarding the profitability of the quarry business" and that "Debtor intentionally concealed the true financial circumstances of the quarry business from McDonald." (Pl.'s Mem. at 18.)

With respect to McDonald's § 523(a)(2)(A) claim, Debtor contends that McDonald has not met his initial burden of proving either that he acted with the requisite fraudulent intent or that McDonald justifiably relied upon Debtor's representations or course of conduct. (Debtor's Mem. at 4.) Debtor argues that McDonald knew the quarry business was a "risky start-up business" (*id.*), and because of the nature of the business, Debtor's representations to McDonald were optimistically speculative in nature (*id.* at 4–5). Debtor further asserts that he intended to repay the loans in full and to succeed in the quarry business, as evidenced by his repayment of Loans 1 and 2, as well as his personal investment of over $657,000.00 in the quarry business. (*Id.*) According to Debtor, McDonald has "not provided any evidence that Debtor did anything but make a series of bad business decisions in which both [he] and [McDonald] willfully participated in." (*Id.* at 7.) By Debtor's account, "[b]oth men actively invested large sums of money in hope of hitting quality bluestone." (*Id.*) Further, Debtor states that McDonald did not prove a causal relationship between his financial loss and statements made in Debtor's emails because Debtor never provided any information to McDonald regarding financials, collateral, inventory, or sales, and McDonald could have at any time taken steps to withhold or deny disbursements under Loans 4 through 13. (*Id.* at 5.)

Debtor similarly argues that McDonald's § 523(a)(2)(B) claim fails because McDonald has acknowledged that Debtor never provided any written information to McDonald as to his overall financial stability or that of the quarry business. (*Id.* at 7.) Rather, Debtor highlights that his email communications requesting additional funds from McDonald generally discussed the

need to make equipment repairs or to meet operating costs to continue to dig for bluestone. (*Id.*) According to Debtor, these emails did not discuss or conceal the true financial condition of the quarry business, but rather "were more indicative of a plea for help by . . . Debtor to keep the business operating." (*Id.* at 7).

## DISCUSSION

"The Bankruptcy Code reflects and balances a number of competing congressional goals." *Falk & Siemer v. Maddigan (In re Maddigan)*, 312 F.3d 589, 596 (2d Cir. 2002). As the Supreme Court observed, one of the primary purposes of the Bankruptcy Code is to "'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" *Local Loan v. Hunt*, 292 U.S. 234, 244 (1933) (quoting *Williams v. U.S. Fidelity & G. Co.*, 236 U.S. 549, 554–55 (1915)). "A second and equally important purpose of bankruptcy is to prevent the dishonest 'debtor's attempts to use the law's protections to shield his or her wrongdoing.'" *Kuper v. Spar (In re Spar)*, 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994) (quoting *Matter of Newmark*, 20 B.R. 842, 852 (Bankr. E.D.N.Y. 1982)). Consistent with these overarching goals, § 523 specifically defines a number of exceptions to the general grant of discharge provided by § 727. Among these exceptions is § 523(a)(2), the function of which is to discourage fraud and provide relief to the victims of fraud. *In re Fosco*, 14 B.R. 918, 922 (Bankr. D. Conn. 1981).

The burden of proof governing actions to except a debt from discharge is well-settled. *See Grogan v. Garner*, 498 U.S. 279, 288–89 (1991). The party seeking to except a debt from discharge bears the ultimate burden of persuasion and must establish such exception by a preponderance of the evidence. *Id.; see also Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d Cir. 1996) ("In order to be awarded an exception from discharge under

section 523(a)(2), a creditor must prove each statutorily enumerated element of fraud by a preponderance of the evidence.") (citing cases).  A fact is proven by a preponderance of the evidence if the Court finds, based on the evidence, that it is more likely than not to be true.  *Bale v. Ryan*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010) (citing *EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 899, 909–10 (5th Cir. 1993)).  In § 523(a)(2) cases, "'once a creditor establishes a *prima facie* case of fraud, the burden of coming forward with some proof or explanation of the alleged fraud shifts to the debtor.'"  *In re Furio*, 77 F.3d at 624 (quoting *Carini v. Matera (In re Matera)*, 592 F.2d 378, 380–81 (7th Cir. 1979) (citing *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975))).  As a threshold matter, when deciding on whether a debt should be excepted from discharge, the Court notes that the claimed exception must be "strictly construed against the creditor and liberally construed in favor of the honest debtor."  *In re Spar*, 176 B.R. at 326 (collecting cases).

The Court now turns to McDonald's various theories and arguments with these directives in mind.  McDonald's main theory of nondischargeability is that the unpaid loans were procured by false pretenses, false representations, or actual fraud under § 523(a)(2)(A).  This section provides as follows:

(a) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt–
        . . .
        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
                (A) false pretenses, a false representation, or actual fraud, other than a statement regarding the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A) (2010).  As the Court acknowledged in prior cases, the scope of this section broadly encompasses three distinct categories of debtor misconduct.  *See, e.g., Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 574 n.291 (Bankr. N.D.N.Y. 2012) (citing

*Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 621 (Bankr. N.D.N.Y. 2010) (collecting cases)). Thus, "[o]ne can satisfy the elements of Section 523(a)(2)(A) by establishing only one of the three types of fraud." *Jadusingh v. Crossfield (In re Crossfield)*, 2012 Bankr. LEXIS 3892, at *11 (Bankr. E.D.N.Y. Aug. 22, 2012) (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 260 (Bankr. S.D.N.Y. 2000)). To be actionable under this section, the debtor's conduct must "'involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient.'" *Kana v. Wintermute (In re Wintermute)*, 2010 Bankr. LEXIS 2941, at *8–9 (Bankr. S.D.N.Y. Aug. 25, 2010) (quoting *Charell v. Gonzalez (In re Gonzalez)*, 241 B.R. 67, 71 (Bankr. S.D.N.Y. 1999)).

Although these frauds may be treated like separate causes of action that encompass different types of mischief and causes of harm, the element of scienter is common to all three. *In re Henderson*, 423 B.R. at 621 (citing *Cochran v. Reath (In re Reath)*, 368 B.R. 415, 422 (Bankr. D. N.J. 2006)). It is this element that is most often determinative of whether the debt at issue is ultimately discharged. *Or. Trial Bank v. Miller (In re Miller)*, 2012 Bankr. LEXIS 1811, at *10 (Bankr. D. Wyo. Apr. 20, 2012) ("The determinative issue when a plaintiff seeks to except debt from discharge under § 523(a)(2)(A) is Defendant's intent at the time the Plaintiff advanced the funds."). As explained below, this element is decisive in this case as well.

"False pretenses" is generally defined as "'conscious or misleading conduct calculated to obtain or deprive another of property.'" *In re Banayan*, 486 B.R. at 574 n. 293 (quoting *Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, 2011 Bankr. LEXIS 3112, at *22 (Bankr. E.D.N.Y. Aug. 16, 2011) (citing *In re Kovler*, 249 B.R. at 261)). It "involves an implied misrepresentation or conduct intended to create and foster a false impression." *Am. Honda Fin.*

*Corp. v. Ippolito (In re Ippolito)*, 2013 Bankr. LEXIS 866, at *16 (Bankr. E.D.N.Y. Mar. 6, 2013) (citing *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 529, 546 (Bankr. E.D.N.Y. 2009) (quoting *In re Weinstein*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983) (internal quotation marks omitted))). "'It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective.'" *In re Banayan*, 486 B.R. at 574 n.294 (quoting *In re Wisell*, 2011 Bankr. LEXIS 3112, at *23 (citing *In re Dobrayel*, 287 B.R. at 12 (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990) (internal quotation marks omitted))). In order to sustain a claim for false pretenses, the plaintiff must establish: "(1) an implied misrepresentation or conduct by the debtor; (2) promoted knowingly and willingly; (3) to create a contrived or misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to the debtor." *In re Henderson*, 423 B.R. at 621 (citing *In re Gabor*, 2009 Bankr. LEXIS 3110, at *12 (Bankr. S.D.N.Y. Oct. 8, 2009) (citing *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007))).

The analysis for "false representation" is similar to that for "false pretenses," as both "involve representations knowingly and fraudulently made that give rise to the debt." *UniWyo Cred. Union v. Crowson (In re Crowson)*, 2010 Bankr. LEXIS 1958, at *7 (Bankr. D. Wyo. June 9, 2010). They differ in that the former requires an express misrepresentation while the latter requires conduct designed to create and foster an impression of false circumstances. *Lazaro v. Weichman (In re Weichman)*, 2010 Bankr. LEXIS 3354, at *47 (Bankr.N.D. Ind. Sept. 30, 2010). "Courts define 'fraudulent misrepresentation' as . . . a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it." *Id.* (citing *In re McGuire*, 284 B.R. 481 (Bankr. D. Colo. 2002) (citing *Restatement*

*(Second) of Torts* § 525 (1976))).  "False representation" for purposes of § 523(a)(2)(A) "can be shown through either an express statement or through an omission where the circumstances are such that disclosure is necessary to correct what would otherwise be a false impression."  *In re Banayan*, 468 B.R. at 575 n.297 (citing *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Trizna v. Lepri & Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992))).  To prove that a debt arose from false representation, the plaintiff must show: "(1) debtor made a false or misleading statement; (2) with the intent to deceive; (3) on which the creditor justifiably relied; (4) in order to induce the creditor to turn over money or property to the debtor."  *In re Henderson*, 423 B.R. at 621 (citing *In re Gabor*, 2009 Bankr. LEXIS 3110, at *12 (citing *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999))).

"Actual fraud" derives from common law and is broadly defined to encompass "'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'"  *In re Banayan*, 468 B.R. at 576 n.307 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 34 (Bankr. E.D.N.Y. 2007) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000))).  To establish a claim for actual fraud, a plaintiff must prove the "five fingers" of fraud: (1) that the debtor made a false representation; (2) that the debtor knew it was false at the time it was made; (3) that the debtor made the representation with the intent of deceiving the plaintiff; (4) that the plaintiff justifiably relied on the representation; and (5) that the plaintiff sustained damages that were proximately caused by the false material representation.  *In re Ippolito*, 2012 Bankr. LEXIS 866, at *15 (collecting cases).

For § 523 purposes, fraudulent intent must be measured as of the inception of the debt. *In re Henderson*, 423 B.R. at 621 (citing *Dawley v. Gould (In re Gould)*, 73 B.R. 205, 227 (Bankr. N.D.N.Y. 1987)); *accord, e.g., Avon v. Ingalls (In re Ingalls)*, 2010 Bankr. LEXIS 483, at *8–9 (Bankr. D.N.J. Feb. 19, 2010) (subsequent representations will have no effect on dischargeability because fraud must have been the methodology by which the money, property, or services were obtained) (quoting *In re Hrabik*, 330 B.R. 765, 772–73 (Bankr. N.D.N. 2005)). Whether a debtor acted with the requisite knowledge and intent to deceive at the time the debt was created are closely related issues of fact. *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301–02 (2d Cir. 1996). A debtor acts with fraudulent intent "if he knows or believes that his statements [regarding his financial ability to perform] are false at the time the statements are made." *In re Gabor*, 2009 Bankr. LEXIS 3110, at *15–16 (Bankr. S.D.N.Y. Oct. 8, 2009) (citing *Taub v. Morris (In re Morris)*, 252 B.R. 41, 48 (Bankr. S.D.N.Y. 2000)). "[I]f at the time of a promise a [debtor] intends to perform but later cannot do so, 'then his initial representation was not false when made.'" *Id.* at *16 (quoting *In re Alicea*, 230 B.R. at 501).

"The most difficult element inherent in any fraud theory is proving what the defendant actually intended at the time of the questioned transaction." *Huggins v. Skinner (In re Skinner)*, 2012 Bankr. LEXIS 5782, at *5 (Bankr. D. Ariz. Dec. 13, 2012). Because direct proof of a debtor's subjective state of mind is generally unavailable, a debtor's knowledge and intent may be inferred from the totality of the circumstances, including a reckless disregard for the truth or falsity of the statements submitted. *In re Bonnanzio*, 91 F.3d at 301–02 (reckless disregard evidences a constructive intent to deceive) (citing cases). Under the totality of the circumstances approach, the court may infer fraudulent intent from various kinds of circumstantial evidence,

including, but not limited to, the levels of experience and financial sophistication of the debtor.

*See In re Bossard*, 74 B.R. 730, 737 (Bankr. N.D.N.Y. 1987) (collecting cases).

In most § 523(a)(2) cases, the burden of proof shifts to the debtor to defend his conduct in the face of a prima facie showing of fraud, and the court's findings with respect to the knowledge and scienter elements of the fraud claim turn principally on the debtor's credibility.  The Court's findings of fact here, however, are based largely on the parties' extensive and detailed email exchanges and other documentary evidence.[4]  To the extent that a credibility determination is required, the Court found Debtor to be a credible witness based on his general demeanor on the witness stand, the consistency of his testimony while under oath, and the inherent probability of the particular facts propounded by Debtor.  *See In re Kovler*, 249 B.R. at 256–57 (discussing the various methods of assessing the credibility of a witness).

Before turning to the heart of the matter, which is McDonald's belief and accusation that his former friend and colleague intended to defraud him, the Court must address whether McDonald established the first element of his claim, i.e., whether Debtor made any actionable representations, or omitted to state material facts, equating to false misrepresentations.  The most obvious of the challenged representations made by Debtor are his admissions regarding the high quality and quantity of stone discovered at the Quarry Property and, by extension, the future profitability of the business.  In particular, Debtor represented that the "quarry had a 40 foot by 300 yard wide strip of red stone" (Joint Stip. at 2) and that, at one point in time, "he had 47 pallets of stand up stone ready [for sale]" (*Id.* at 3).  In an email to McDonald during the quarry's early operations, Debtor also represented that he and McDonald would "be in heaven" once they "got down to the plate."  (Pl.'s Ex. 28.)  McDonald did not show that these representations were

---

[4] The testamentary evidence did little more than highlight what the parties considered to be the relevant or probative portions of the email documents admitted into evidence.

untrue and the record does not support such a finding.  Rather, the record contains proof that Debtor engaged Eichelbergers to perform drilling at the Quarry Property in order to determine the availability and quantity of stone.  (Pl.'s Ex. 8.)  Debtor testified that Eichelbergers' representative drilled in multiple places and pulled four-foot samples of earth after which he verbally verified to Debtor the presence, defects, and properties of both redstone and bluestone block deep below the Quarry Property's surface.  Debtor further testified that he believed the Quarry Property contained a sixty mile radius of Pennsylvania bluestone, thus making it one of the richest sources of natural bluestone in the world.  This testimony was buttressed by photographic evidence of the Quarry Property (Pl.'s' Ex. 94), which revealed new infrastructure, heavy machinery, multiple excavation pits and site work, stone fragments, and pallets of field stone ready for transport.  Nothing in the record contradicts Debtor's representations regarding the composition or physical qualities of the Quarry Property.  Without more, such as an expert report or testimony, the Court cannot find in McDonald's favor on the first element.

McDonald also points to certain representations made by Debtor concerning McDonald's desired partnership agreement with Debtor and purported collateralization by retirement accounts and machinery.  McDonald contends that Debtor never advised McDonald that he had withdrawn funds from his retirement accounts to invest in the quarry business or that he had obtained additional sources of funding and, thus, additional lenders to whom he also owed significant business debts.  McDonald has not shown, however, that Debtor had a duty to disclose this information to him, including, but not limited to, the status of his retirement accounts or the borrowing relationship with and obligations owed to Pennstar.  *See In re Banayan*, 468 B.R. at 574 n.295 ("Silence, or the concealment of a material fact, when there is a duty to disclose, may constitute the basis of false pretenses.") (citing *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369

(Bankr. S.D.N.Y. 1996) (collecting cases)).    Debtor's failure to disclose this information

therefore cannot be characterized as a misrepresentation for purposes of § 523(a)(2)(A).    Hence,

McDonald has not satisfied the first element of his § 523(a)(2)(A) claim.

Accordingly, the Court's inquiry could end here.    *See Holmes v. Bulei (In re Bulei)*, 1995

Bankr. LEXIS 983, at *10 (Bankr. E.D. Pa. July 20, 1995) (indicating that plaintiff's

establishment of the first element that there was a clearly cognizable misrepresentation is of

"critical significance"  because a determination of the last four elements, i.e., whether the

misrepresentation was knowing, intentional, and resulted in reliance and damages, is dependent

upon the same).    However, given the parties' history and McDonald's personal financial stake in

the outcome of this proceeding, the Court believes that McDonald deserves an answer to the

specific question of whether Debtor intended to defraud him.

Turning to the second and third elements of McDonald's § 523(a)(2)(A) claim, the record

in this case provides insufficient proof to satisfy the knowledge and intent requirements of §

523(a)(2)(A).    Based on the totality of the record, and even assuming that the Court had ruled

differently as to the first element, the Court is unpersuaded that Debtor acted with the knowledge

and specific intent to cheat, deceive, or defraud McDonald.    The Court is unable to draw an

inference of fraud given the numerous operational and financial setbacks that Debtor in fact

disclosed to McDonald, none of which deterred McDonald from continuing to lend Debtor

money.    It is not apparent from the record that Debtor was either hopelessly insolvent or without

any intent to repay McDonald at the time that he requested Loans 3 through 13.    Rather, Debtor

testified that he believed the quarry business would be highly successful, and he supported this

belief by sinking his own life savings into the business venture and continuing to borrow

working capital from Pennstar, and physically working the Quarry Property for as long as

possible.  He also demonstrated his intent to repay McDonald by repaying Loans 1 and 2 in full.

More importantly, when Debtor requested additional loans from McDonald, he advised

McDonald of the purpose for each additional funding request and of his inability to otherwise

pay operating expenses or business costs as they accrued.   In many of the parties' email

communications, Debtor painted a picture of a desperate financial condition caused by his gross

underestimation of the initial start up and daily operating costs for this type of business venture.

        Contrary to McDonald's assertion, the record supports a finding of good faith on the part

of Debtor to utilize the Quarry Property which he had inherited years earlier to begin a legitimate

quarry business.   Based on the evidence, the Court is convinced that Debtor in fact believed

during his dealings with McDonald that the quarry business would eventually yield high profits.

However, Mother Nature coupled with his limited experience ultimately proved him wrong.  For

example, Debtor testified that poor weather conditions and equipment issues stalled excavation

and delayed production.   He further testified that he never hit block and that the stone mined

failed field tests for hardness, which rendered it unsellable.   It appears the parties' misfortunes

were caused by an incredibly risky and unpredictable choice of business venture, which has

proven to be the case only in hindsight.  *See, e.g., In re Nelson*, 1993 U.S. Dist. LEXIS 4681, at

*10 (N.D. Ca. Apr. 6, 1993) ("Merely because a debtor's hopes of repaying a loan are

'unrealistic in hindsight' does not constitute fraudulent conduct warranting nondischarge.")

(citing *In re Karelin*, 109 B.R. 943 (B.A.P. 9th Cir. 1990)).   For all these reasons, McDonald's §

523(a)(2)(A) claim must fail.

        McDonald's alternative theory of recovery is that the unpaid loans were procured by

Debtor's use of a false financial statement under § 523(a)(2)(B), which provides:

(a) A discharge under section 727, . . . of this title does not discharge an individual
    debtor from any debt–
        . . .
    (2) for money, property, services, or an extension, renewal, or refinancing of
credit, to the extent obtained, by–
        (B) use of a statement in writing–
            (i) that is materially false;
            (ii) respecting the debtor's or an insider's financial condition;
            (iii) on which the creditor to whom the debtor is liable for such money,
        property, services, or credit reasonably relied; and
            (iv) that the debtor caused to be made or published with intent to
        deceive; . . . .

11 U.S.C. § 523(a)(2)(B) (2010).  The United States Supreme Court described the subsections of

§ 523(a)(2) under which McDonald moves as "two close statutory companions barring

discharge."  *Field v. Mans*, 516 U.S. 59, 66 (1995) (holding that under § 523(a)(2)(A), a

justifiable reliance standard governs the analysis, while under § 523(a)(2)(B), a reasonable

reliance standard controls).  Whereas § 523(a)(2)(A) "applies expressly when the debt follows a

transfer of value or extension of credit induced by falsity or fraud (not going to financial

condition)," § 523(a)(2)(B) applies "when the debt follows a transfer or extension induced by a

materially false and intentionally deceptive written statement of financial condition upon which

the creditor reasonably relied."  *Id.*

While the Court's finding above regarding Debtor's lack of fraudulent intent is sufficient

to also dismiss McDonald's § 523(a)(2)(B) claim, this claim fails upon the earlier ground that

McDonald did not satisfy even the threshold requirement of § 523(a)(2)(B) that Debtor issued a

statement in writing misrepresenting his overall net worth or financial condition.  *In re Banayan*,

468 B.R. at 575–76 (noting that the term is not defined in the Bankruptcy Code and, after

analysis of existing case law, adopting the so-called "strict interpretation" requiring that the

statement address the debtor's overall financial health rather than the status of a single asset or

liability).  Here, both parties agree that Debtor never provided McDonald with any of the

financial information requested, including profit and loss statements, a schedule of assets and liabilities, or balance sheets. For this reason alone, McDonald cannot sustain his § 523(a)(2)(B) claim.

## CONCLUSION

Understandably, in an attempt to obtain full recovery of his life savings, McDonald ignored the warning signs and continued to lend funds to Debtor, thereby hedging his bets that the quarry business would turn the corner to profitability. In effect, McDonald was throwing good money after bad because the quarry business ultimately proved to be a losing proposition for not just McDonald but Debtor as well. Since no fraud occurred, neither of McDonald's § 523(a)(2) claims can be sustained and Debtor's judgment debt to McDonald is dischargeable.

Accordingly, it is hereby

**ORDERED**, that the Complaint is dismissed.

Dated at Utica, New York
this 29th day of May 2013

/s/Diane Davis_____
DIANE DAVIS
United States Bankruptcy Judge